# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WINDY PAYNE, individually and as
guardian on behalf of; D.P., a
minor child,
        *Plaintiffs-Appellants,*

v.

PENINSULA SCHOOL DISTRICT, a
municipal corporation; ARTONDALE
ELEMENTARY SCHOOL, a municipal
corporation; JODI COY, in her
individual and official capacity;
JAMES COOLICAN, in his individual
and official capacity; JANE DOES 1-
10; JOHN DOES 1-10,
        *Defendants-Appellees.*

No. 07-35115

D.C. No.
CV-05-05780-RBL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
August 8, 2008—Seattle, Washington

Filed March 18, 2010

Before: Harry Pregerson, Cynthia Holcomb Hall and
John T. Noonan, Circuit Judges.

Opinion by Judge Hall;
Dissent by Judge Noonan

4381

**COUNSEL**

Thomas B. Vertetis, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP, Tacoma, Washington, for the appellant.

Michael A. Patterson and Donald F. Austin, Patterson Buchanan Fobes Leitch & Kalzer P.S., Seattle, Washington, for the appellees.

**OPINION**

HALL, Senior Circuit Judge:

Windy Payne ("Payne"), the mother of D.P., an autistic student, appeals from the district court's dismissal without prejudice of the suit she brought on D.P.'s behalf for negligence, outrage, and § 1983 violations.[1] Her claims were predicated on D.P.'s constitutional rights and statutory rights under the Individuals with Disabilities Education Act ("IDEA"). The district court found that it lacked subject matter jurisdiction over Payne's federal claims because Payne failed to exhaust her administrative remedies before coming into federal court.[2] We have jurisdiction pursuant to 28 U.S.C. § 1291 and agree.

---

[1]Payne also asserted her own emotional distress claim under a negligence cause of action. Because this cause of action arises under state law, however, the district court's jurisdiction over it was only supplemental, and that court could properly decline to exercise jurisdiction on an independent basis after the federal claims had been dismissed.

[2]The treatment of this issue as jurisdictional was consistent with this circuit's precedent at the time of the district court's opinion. *See Robb v.*

## I.

Because this appeal arises from a grant of summary judgment, we present the facts in the light most favorable to Payne. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

D.P. suffers from moderate autism, which has delayed his academic progress and caused his resistance to work, his difficulties staying on task, and his impulsive, "inappropriate or aggressive" responses to his environment. In September 2003, as is required under the IDEA, *see* 20 U.S.C. § 1414 (2006), an Individualized Education Plan ("IEP") was developed for D.P. to address these limitations and provide appropriate education. That plan placed him in a transition classroom at Artondale Elementary School, set out instructional goals, and, most relevant to this case, sought to address his behavioral issues through various intervention methods, including the use of time-out in a "safe room."

This case concerns that safe room, a roughly 5′ x 6′ room located within the special education classroom. It is the teacher's use of that room with D.P., rather than the room itself, that is at issue here. The parties dispute the details as to what Payne consented to (i.e. a locked, closed door, with no adult inside), the duration of D.P.'s periods of confinement, and whether the window was covered. However, they agree that D.P. was locked in the room on multiple occasions in response to his classroom behavior. On several occasions, he

Bethel School District, 308 F.3d 1047 (9th Cir. 2002) It is unclear whether the failure to exhaust is still a jurisdictional matter after the Supreme Court's decision in *Jones v. Bock*. *See* 549 U.S. 199, 216 (2007) (finding failure to exhaust to be an affirmative defense under the Prison Litigation Reform Act ("PLRA")); *Robb*, 308 F.3d at 1051 (describing the PLRA's exhaustion requirement as similar to the IDEA's). However, the parties have not raised this issue and we decline to reach it, though we note that Appellees did include the failure to exhaust as an affirmative defense in their answer to Payne's complaint.

removed his clothes in there, and urinated and defecated on himself. He helped his teacher, Jodi Coy, clean up his excrement. He began to exhibit anxious behaviors and experience emotional and scholastic setbacks

Payne was wary of the safe room's use from the beginning. The Paynes consulted with Coy and other District administrators regarding its use during the IEP's development and after the defecating incident, expressing concerns over having D.P. in there with a closed door and no adult inside. Coy defended her use of the safe room as an appropriate response to D.P.'s attempts to gain attention through his misbehavior. The Paynes continued to have disagreements with Coy and administrators regarding access to the classroom and D.P.'s outside tutoring, which led them to request repeatedly that D.P. be moved from Coy's classroom. When those requests were denied, the Paynes requested mediation. Though that mediation resulted in an agreement that D.P. would be transferred to another school in the district, the record suggests that the Paynes did not attempt to address D.P.'s emotional problems there and that they were later unhappy with the District's provision of the services to which it had agreed. Despite the mediation agreement's failure to resolve all of Payne's issues with the District's provision of services, Payne never sought an impartial due process hearing. D.P. is currently being home-schooled.

In December 2005, Payne filed a complaint in the district court. Payne claims the teacher's use of the room caused her son's "significant regression in communicative and sensory functions," the diminishment of his "academic prowess and abilities," and the continuing "signs of emotional trauma." She sought general damages for "extreme mental suffering and emotional distress and special damages," as well as punitive damages for the violation of D.P.'s civil rights, and declaratory relief stating that the District's safe room policy was tortious and unconstitutional.

Appellees Peninsula School District, Artondale Elementary School, Coy, and James Coolican (collectively "Appellees") filed a motion for summary judgment. The district court found that it lacked subject matter jurisdiction over Payne's federal claims because Payne failed to exhaust her administrative remedies before coming into federal court. It then declined to exercise supplemental jurisdiction over her state law claims, finding no independent basis for jurisdiction over them.

## II.

We review *de novo* both a district court's decision to grant summary judgment, *Univ. Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004), and its determination of whether it has subject matter jurisdiction, *see Schnabel v. Lui*, 302 F.3d 1023, 1028-29 (9th Cir. 2002).

To ensure "appropriate public education that emphasizes special education and related services designed to meet [the] unique needs" of children with disabilities, the IDEA requires school districts to develop IEPs outlining the educational services to be provided for those children. 20 U.S.C. § 1400(d)(1)(A); *id.* § 1414(d). Those services include "developmental, corrective, and other supportive services" that address a wide range of academic, emotional, and physical issues "as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26).

**[1]** In order to carry out these objectives and permit parental involvement, the IDEA created procedural safeguards. *See Robb v. Bethel School District*, 308 F.3d 1047, 1049 (9th Cir. 2002). If parents are not satisfied with decisions regarding their child's educational program or with the services provided, they are guaranteed an "impartial due process hearing." *Id.* § 1415(f). They must exhaust this procedure prior to filing a civil action. *Id.* § 1415(l). This exhaustion requirement recognizes the traditionally strong state and local interest in education, allows for the exercise of discretion and educational

expertise by state agencies, affords full exploration of technical educational issues, furthers development of the factual record and promotes judicial efficiency by giving state and local agencies the first opportunity to correct shortcomings. *Kutasi v. Las Virgenes Unified Sch. Dist.*, 494 F.3d 1162, 1167 (9th Cir. 2007). Plaintiffs "seeking relief that is also available under" the IDEA must exhaust procedures "to the same extent as would be required had the action been brought under" the IDEA. 20 U.S.C. § 1415(l).

We have two cases controlling our analysis: *Witte v. Clark County School District*, 197 F.3d 1271, 1275 (9th Cir. 1999) (where exhaustion was not required), and *Robb v. Bethel School District*, 308 F.3d 1047, 1049 (9th Cir. 2002) (where it was). In *Witte*, a student with Tourette's Syndrome filed a civil action seeking damages for past physical and emotional abuse after he was allegedly force-fed food to which he was allergic, strangled, subjected to physical "take downs," forced to walk and run despite hindering deformities, and deprived of food. *See* 197 F.3d 1271. In *Robb*, a student with cerebral palsy filed an action seeking damages for emotional trauma and lost educational opportunities after she was removed from the classroom for peer tutoring. *See* 308 F.3d 1047.

**[2]** The *Witte* court decided exhaustion was not necessary because the parties (1) had resolved all educational issues through the IEP process, (2) sought only retrospective damages, and (3) had claims centering around physical abuse and injuries. *Witte*, 197 F.3d at 1275-76. *Robb* found that exhaustion was required and distinguished itself from *Witte* because its plaintiffs (1) had not taken full advantage of IDEA administrative procedures, (2) requested money damages to compensate for "psychological and educational injuries the IDEA may remedy," and (3) did not claim physical injury. *Robb*, 308 F.3d at 1052. In both cases, the inquiry may be boiled down to one central question: whether the plaintiffs "seek relief for injuries that could be redressed to any degree by the IDEA's administrative procedures." *Kutasi v. Las Virgenes*

*Unified Sch. Dist.*, 494 F.3d 1162, 1163-64 (9th Cir. 2007). If the answer to that question is either yes or unclear, exhaustion is required. *See id.* at 1168 (citing *Robb*, 308 F.3d at 1050).

Our analysis depends primarily on whether this case is more like *Witte* or *Robb*. Factually, we are somewhere in between. This case does not involve actions equivalent to forcing-feeding, strangulation, "take downs," or food deprivation, actions which were part of no IEP and "served no legitimate educational purpose." *Witte*, 197 F.3d at 1273. However, this case likewise is not so purely educational as *Robb*, where a child was taken out of class and given peer tutoring on a hallway floor instead. *See* 308 F.3d at 1048. Instead, we are in a middle ground involving disciplinary measures employed as a part of a larger educational strategy.

**[3]** Payne would have us draw a hard line between discipline and education, and place this case on the side of *Witte*, where the child was punished for actions related to his disabilities. That would oversimplify the issue. *Witte* concerned abuses which served "no legitimate educational purpose," and, indeed, it is hard to fathom the pedagogy behind feeding a child a food to which he was allergic or choking him to make him run faster, to take two examples. *See Witte*, 197 F.3d at 1273. But we have also recognized that "[p]roper conduct and education are inextricably intertwined" in the context of special education. *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1491 (9th Cir. 1986). The two are connected here, where D.P.'s IEP includes aversive and behavioral intervention plans to address his tendency to bite, scratch, yell, and refuse to stay on task, and where Washington law includes isolation rooms among the disciplinary measures schools may employ to enforce their rules. *See* Wash. Admin. Code § 180-40-235; *id.* § 392-172-394. Thus, this case is unlike *Witte*, where "neither the genesis nor the manifestations of the abuse were educational." *Robb*, 308 F.3d at 1052. Instead, like the conduct at issue in *Robb*, the use of the safe room here was

"at least . . . an attempt at an educational program." *Id.* at
1052 n.3 (internal quotation marks omitted).

**[4]** Because we are persuaded that this case is more akin
to *Robb*, we believe that exhaustion was required. As in *Robb*,
Payne has not taken full advantage of the IDEA administra-
tive procedure because she did not seek an impartial due pro-
cess hearing, even though the mediation failed to resolve all
issues regarding the District's provision of educational ser-
vices and even though her complaint reflects an ongoing con-
cern with safe rooms as they were used with D.P. *See* 20
U.S.C. § 1415(f), (l). Like the *Robb* plaintiffs, Payne also
claims injuries—"significant repression in communicative
and sensory functions," diminished "academic prowess and
abilities," and continued emotional trauma in D.P.—for which
IDEA provides some relief. *See id.* § 1401(26) (outlining aca-
demic, psychological, and therapeutic corrective and support-
ive services provided). Finally, Payne is also not claiming
physical injuries for D.P. within the meaning of *Witte*. *See*
197 F.3d 1271, 1273, 1276 (9th Cir. 1999) (describing forced
feeding and walking, strangulation, and "take downs" as
physical abuse and injuries).

Payne's arguments to the contrary are unavailing. Even
though monetary damages are not ordinarily available under
the IDEA, *see id.* at 1275, she may not avoid the exhaustion
requirements by requesting only monetary damages, *see
Robb*, 308 F.3d at 1049. Neither may she avoid those require-
ments by attempting on appeal to recast her damages as retro-
spective only when her complaint clearly alleges ongoing
injuries. *See id.* at 1053 n.4 (declining to permit the plaintiffs
to reframe their claims as retrospective only on appeal when
they had not attempted to limit their damage claim in the dis-
trict court).

**[5]** Finally, the fact that D.P. is currently home-schooled
does not automatically make any administrative remedies
futile. *See N.B. v. Alachua County Sch. Bd.*, 84 F.3d 1376,

1379 (11th Cir. 1996) (holding that parents' removal of a child from the school district does not excuse the failure to exhaust administrative remedies), *cited with approval in Robb*, 308 F.3d at 1049. The fact that services may not be the remedy Payne *wants* does not decide the question. *See Robb*, 308 F.3d at 1049 ("We understand 'available' relief to mean relief suitable to remedy the wrong done the plaintiff, which may not always be relief in the precise form the plaintiff prefers."). Instead, she must prove futility. *Id.* at 1050 n.2. Her conclusory statements that D.P. would not benefit from services do not meet that burden.

**[6]** Simply put, Payne is contesting one part of the comprehensive educational strategy used to address D.P.'s unique situation. The safe room was included in his IEP, is a recognized educational tool under Washington statutes, *see, e.g.*, Wash. Admin. Code § 392-172-394, and its use allegedly led to injuries that the services provided under the IDEA are meant to address. This is not to say we condemn or endorse the manner in which the safe room was used here. Rather we believe that, as an educational strategy (even if a misguided or misapplied one), it was better addressed initially by the administrative process. Therefore, we uphold the district court's dismissal of the claims made on D.P.'s behalf.

For these reasons, the district court's decision is **AFFIRMED**.

---

NOONAN, Circuit Judge, dissenting:

My colleagues, struggling to find a way between *Robb* and *Witte* find at least "an attempt at an educational program" in a teacher repeatedly locking D.P., a seven-year old autistic child, into an unventilated, dark space the size of a closet for indeterminate amounts of time, causing D.P. to become so fearful that he routinely urinated and defecated on himself. I

disagree with the majority's characterization of Coy's conduct as part of an "educational strategy," the resolution of which would require exhaustion under the IDEA. I respectfully dissent.

Viewing the facts as we must, in the light most favorable to the Paynes, it is clear that Ms. Coy's misuse of the isolation room serves no legitimate educational purpose, is prohibited by state administrative regulations, and was imposed as punishment. The facts in this case are closer to those in *Witte v. Clark County School District*, 197 F.3d 1271 (9th Cir. 1999) than in *Robb v. Bethel School District*, 308 F.3d 1047 (9th Cir. 2002). As in *Witte*, D.P. was subjected to mistreatment that was part of no IEP and "served no legitimate educational purpose." 197 F.3d at 1273. While D.P.'s proposed "behavior intervention plan" included "containment in [a] safe room," it did not authorize the misuse at issue here.

The Washington Administrative Code requires extensive procedural and substantive safeguards for the use of an isolation room as an aversive intervention. *See* Wash. Admin. Code 392-172A-03130(2). Among the requirements are that the student's IEP must provide for the isolation and "duration of its use," and the enclosure must be "ventilated," "lighted," and "permit continuous visual monitoring of the student from outside the enclosure." *Id.* The regulations also require that "either the student shall be capable of releasing himself or herself from the enclosure or the student shall continuously remain within view of an adult responsible for supervising the student." *Id.* The regulations prohibit isolation without the requisite safeguards, listing such isolation along with other interventions that are "manifestly inappropriate by reason of their offensive nature or their potential negative physical consequences, or their legality." *Id.* at 392-172A-03125. These practices include: stimulating a student with electric current; throwing, kicking, burning, or cutting a student; striking a student with a closed fist; threatening a student with a deadly weapon; denying or delaying medication or common hygiene

care; and submerging a student's head in water. *See id.* If a student were subject to any of these prohibited practices, one presumes that full exhaustion of the IDEA administrative processes would not be required.

If we see the facts in the light most favorable to the Paynes, Ms. Coy mistreated D.P. by using the isolation room in a manner explicitly prohibited by the state regulations: covering up the window, locking the door, forcing D.P. to stay locked inside for prolonged and indeterminate periods of time, and failing to place a teacher or aide in the room or at least outside the room with the door open. The alleged conduct *goes far beyond that in Robb*, in which a student was removed from her class for peer tutoring that occurred on the floor of a dim hallway with no chair or desk for her to use. 308 F.3d at 1048. Here was neither education nor attempt at education. Here was a return to the bleak black days of Dickensian England. *See C. Dickens, Oliver Twist*, chapters 2 and 3.

Accordingly, I would hold under *Witte* that, exhaustion under the IDEA is not required.